IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

BOBBY N. GOLDSMITH,         )
                       )
       Plaintiff,         )
                       )
v.                     )     CIVIL ACTION NO 04-0242-WS-L
                       )
JO ANNE B. BARNHART,        )
Commissioner of Social Security,   )
                       )
       Defendant.       )

## REPORT AND RECOMMENDATION

Plaintiff brings this action under 42 U.S.C. § 405(g) and § 1383(c)(3) seeking judicial review of a final decision of the Commissioner of Social Security denying his claim for Social Security disability insurance benefits and supplemental security income benefits.  This action was referred to the undersigned for report and recommendation pursuant to 28 U.S.C. §636(b)(1)(B).  Oral argument was held on February 1, 2005 and additional briefing was provided by the parties. (Docs. 19, 24, 25). Upon consideration of the administrative record, oral argument, and the memoranda of the parties, it is recommended that the decision of the Commissioner be **affirmed.**

I.    Issues on Appeal

    1. Whether the Administrative Law Judge (ALJ) erred by refusing to recuse himself.

    2. Whether the ALJ erred by giving more weight to the opinion of the consultative physician than to the opinion of plaintiff's treating physician.

    3. Whether the ALJ erred by concluding plaintiff could return to his past relevant work as a custodian without making specific findings regarding the physical and mental demands of this work as

required by Social Security Ruling 82-62.

    4.  Whether the ALJ erred by relying on the vocational expert's response to an incomplete hypothetical question.

    **II.**    <u>**Background Facts**</u>

    Plaintiff was born February 7, 1959 and was forty-four years old at the time of the administrative hearing on July 17, 2002. (Tr. 69, 251).  Plaintiff attended special education classes and obtained a GED certificate. (Tr. 96).[1]  He has past relevant work as a janitor and checking electrical appliances which were donated to a charitable organization. (Tr. 91).  He also worked for approximately two weeks making pet toys. (Tr. 91).  Plaintiff alleges that he became unable to work on May 14, 2001 because of chronic back and knee pain and the residuals of childhood polio. (Tr. 69, 90).

    **III.**    <u>**Procedural History**</u>

    Plaintiff applied for disability insurance benefits and supplemental security income on May 14, 2001. (Tr. 68-71, 200-208).  The applications were denied initially. (Tr. 34-44, 209-214).[2]  The first administrative hearing was scheduled for May 6, 2002 but was dismissed. (Tr. 289-293).  The second administrative hearing was held on July 17, 2002 and present were plaintiff, his counsel and a

---

[1]On his report, plaintiff marked that he attended special education classes. (Tr. 96).  However, the confidential psychological report dated April 4, 1976 indicated that plaintiff was a "slow learner" but "should be considered for placement in the regular classroom and for graduation as soon as possible.  Since his verbal skills remain lower than the 'average' student's, he will continue to need remedial aid and special support from his teachers." (Tr. 136).

[2] The reconsideration stage was eliminated from this case pursuant to a test of modifications to the disability determination. 20 C.F.R. §§ 404.906, 404.966, 416.1406 and 416.1466.

vocational expert. (Tr. 251).  On September 16, 2002, the ALJ entered a decision wherein he found

the plaintiff not disabled. (Tr. 18-29).  On March 26, 2004, the Appeals Council denied the request for

review and the hearing decision became the final decision of the Commissioner of Social Security. (Tr.

6-8).

**IV**.    **Findings of the Administrative Law Judge**

The ALJ found plaintiff has the severe impairments of degenerative disc disease of the lumbar

spine and bilateral hip osteoarthritis. (Tr. 20, 28).  The ALJ found that these impairments   singly or in

combination did not meet or medically equal a listing in the Listing of Impairments. 20 C.F.R.  Pt. 404,

Subpt. P, App. 1. (Tr. 23, 28).  The ALJ found plaintiff had the residual functional capacity for medium

work which does not require more that occasional operation of automobile equipment and does not

require concentrated exposure to unprotected heights or moving machinery. (Tr. 25, 28).  The ALJ

found plaintiff's subjective complaints were not fully credible. (Tr. 23-25, 28).  Based upon plaintiff's

residual functional capacity, the ALJ found he could return to his past relevant work as a janitor and

could also perform other work which exists in significant numbers in the national economy. (Tr. 26-28).

**V**.    **Plaintiff's Testimony**

At the hearing, plaintiff testified as follows:

Plaintiff attended special education classes and received a card for staying in school for twelve

years. (Tr. 268).[3]  His wife helps complete the Social Security forms. (Tr. 270).  He can read, write

and make change. (Tr. 270-271).  Plaintiff was in the Army for three or four years. (Tr. 271).  His jobs

---

[3] Plaintiff's testimony was unclear as to whether he took the GED test or received a certificate
of completion in lieu of an academic diploma. (Tr. 269-270).

3

have required physical strength. (Tr. 268).  Plaintiff was fired from his last job because of suspected alcohol use at work.[4]  Plaintiff drank alcohol the night before work to numb his pain so he could sleep. (Tr. 252-253).

Plaintiff can walk less than a block and stays close to home because he is afraid his leg will go out. (Tr. 255).   He can stand or walk for about ten to twenty minutes and sit for about an hour. (Tr. 256-257).  He can lift and carry about five pounds. (Tr. 257).

For about three or four years, plaintiff worked as a furniture mover at Goodwill until he could no longer do the work. (Tr. 259-260).  He worked at his most recent job making pet toys for about two weeks. (Tr. 260).  He experienced pain at this job even though he sat to do the work. (Tr. 260-261).

Plaintiff went to the emergency room for treatment for pain in his back and legs. (Tr. 261).  He was given a shot and pain medication.  (Tr. 261).  He followed up with a family physician after his emergency room visit.  The medication the physician prescribed helped plaintiff's back but not his legs. (Tr. 262-263).  Plaintiff was referred to a neurologist by his family physician and the neurologist took MRIs of his back and hips. (Tr. 263).  Plaintiff was scheduled for an epidural injection but it was cancelled because of his elevated blood pressure. (Tr. 265).

Plaintiff testified that he has tingling, numbness, swelling and blistering in his legs.  He has some

---

[4] On the drug and alcohol questionnaire, plaintiff reported that he drank a daily "6 pack" and "sometimes shots of vodka".  He reported that alcohol became a problem when he was twenty-seven but he does not binge or black out.  He reported that alcohol did not interfere with work, family or friends.  He also reported that "he feels better next morning." He reported that he lost one job due to alcohol, had been in treatment five years ago and had DUI's in the 1980's. (Tr. 105-106).

4

problem with his legs every day and has problems sleeping at night because of his legs.   He can not walk because his legs get tired and weak which cause him to fall. (Tr. 268).  He lives with his pain but it worsened on his most recent attempt to work. (Tr. 275).  His hands cramp and lock up when he uses them frequently. (Tr. 267).  Plaintiff was taking Celebrex at the time of the hearing and reported no side effects from the medication. (Tr. 281, 131).[5]

Plaintiff lives with his wife and twenty-five year old son.  (Tr. 272-273).  His wife works as a waitress. (Tr. 272).  He has three grandchildren who are two, five and seven years old. (Tr. 272).  He spends each day sitting and walking, trying to "stay mobile" and "looking out for my little grandbabies." (Tr. 273).  His driving license was suspended for a DUI and he no longer drives. (Tr. 273).  He drinks occasionally and smokes a pack of cigarettes each day. (Tr. 274).  He takes care of his personal needs. (Tr. 274).  He occasionally attends church but otherwise does not participate in church activities. (Tr. 274). [6]

**VI**.   **Vocational Expert Testimony**

The VE testified that plaintiff has a limited education.  He also testified that plaintiff's past work as an electrical technician was light, semiskilled work; his past work as a laborer was heavy, unskilled work; and his past work as a custodian (janitor) was medium, unskilled work.

The ALJ posed a hypothetical question to the VE based upon a person forty-four years of age, with a limited education and past relevant work as that performed by the plaintiff and the physical

---

[5] He previously reported taking Vioxx for pain and Rolaxin for muscle spasm. (Tr. 129).

[6] Plaintiff previously reported that he could work for about an hour before needing a break and that sometimes he cooked and cleaned but someone else shopped for him. (Tr. 121-122, 133).

capacities identified by Dr. Crotwell, the orthopedic consultative examiner, (Tr. 170-171),[7] and asked

whether such a person could perform any of plaintiff's past relevant work.  The VE testified that

plaintiff's past work "would fit within [those] parameters." (Tr. 282).  The VE testified that the

hypothetical person also could work as a hand packager, food assembler or perform light cleaning all of

which exist in significant numbers in the national economy. (Tr. 283).  The VE also testified that the

hypothetical person could perform the sedentary unskilled job of assembler or bench work both of

which exist in significant numbers in the national economy. (Tr. 283).

The VE then posed a second hypothetical containing the same vocational elements as the first

hypothetical but with the physical capacities evaluation prepared by Dr. Robert White, the neurologist,

except  with adjustments which limited plaintiff to occasional bending, squatting, crawling, and climbing

and frequent reaching. (Tr. 284).  The VE testified that the person would be limited to light to sedentary

work and jobs such as light or sedentary assembler would be reduced by fifty per cent because of the

need for a sit-stand option.  The VE testified that these jobs exist in significant numbers in the national

economy.  (Tr. 285).

The ALJ presented a third hypothetical question which included the same vocational elements

and the physical capacities evaluation prepared by Dr. White which limited plaintiff to occasionally

reaching and never bending, squatting, climbing or crawling.  The VE responded that the hypothetical

person could not work. (Tr. 285-286).  The VE also testified that if plaintiff's testimony was accepted

---

[7] The VE interpreted the orthopedist's opinion as finding plaintiff could perform medium, light
or sedentary exertional work with the limitations of  a moderate restriction from unprotected heights and
a mild restriction of exposure to moving machinery and driving automotive equipment. (Tr. 170-171).

as fully credible, he would be unable to work. (Tr. 285).

**VII.   Analysis**

    **A.   Standard of Review.**

    In reviewing claims brought under the Act, this court's role is a limited one.  The court may not decide the facts anew, reweigh the evidence, or substitute its judgment for that of the Commissioner. Sewell v. Bowen, 792 F.2d 1065, 1067 (11th Cir. 1986).  The Commissioner's findings of fact must be affirmed if they are based upon substantial evidence.  Brown v. Sullivan, 921 F.2d 1233, 1235 (11th Cir. 1991) (citing Bloodsworth v. Heckler, 703 F.2d 1233, 1239 (11th Cir. 1983)).  Substantial evidence is defined as "more than a scintilla but less than a preponderance," and consists of "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 390, 401, 91 S.Ct. 1420, 1427 (1971);  Bloodsworth, 703 F. 2d at 1239.  The Commissioner's decision must be affirmed if it is supported by substantial evidence even when a court finds that the preponderance of the evidence is against the decision of the Commissioner. Richardson, 402 U.S. at 401, 91 S.Ct. at 1427 (1971); Bloodsworth, 703 F.2d at 1239.  "In determining whether substantial evidence exists, we must view the record as a whole, taking into account evidence favorable as well as unfavorable to the [Commissioner's] decision."  Chester v. Bowen, 792 F.2d 129, 131 (11th Cir. 1986).  Further, it has been held that the Commissioner's "failure to apply the correct law or to provide the reviewing court with sufficient reasoning for determining that the proper legal analysis has been conducted mandates reversal."  Cornelius v. Sullivan, 936 F.2d 1143, 1145-46 (11th Cir.1991).  This court's review of the Commissioner's application of legal principles is plenary.  Walker v. Bowen, 826 F.2d 996, 999 (11th Cir. 1987).

**B.**    **Statement of the Law**

An individual who applies for Social Security disability benefits or supplemental security income must prove their disability. See 20 C.F.R. § 404.1512; 20 C.F.R. § 416.912. Disability is defined as the "inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. § 404.1505(a); 20 C.F.R. § 416.905(a). The Social Security regulations provide a five-step sequential evaluation process for determining if a claimant has proven their disability. See 20 C.F.R. § 404.1520; 20 C.F.R. § 416.920. At the first step, the claimant must prove that he or she has not engaged in substantial gainful activity. At the second step, the claimant must prove that he or she has a severe impairment or combination of impairments. If, at the third step, the claimant proves that the impairment or combination of impairments meets or equals a listed impairment, then the claimant is automatically found disabled regardless of age, education, or work experience. If the claimant cannot prevail at the third step, he or she must proceed to the fourth step where the claimant must prove inability to perform their past relevant work. Jones v. Bowen, 810 F.2d 1001, 1005 (11th Cir. 1986). In evaluating whether the claimant has met this burden, the examiner must consider the following four factors: (1) objective medical facts and clinical findings; (2) diagnoses of examining physicians; (3) evidence of pain; (4) the claimant's age, education and work history. Id., at 1005. Once a claimant meets this burden, it becomes the Commissioner's burden to prove at the fifth step that the claimant is capable of engaging in another kind of substantial gainful employment which exists in significant numbers in the national economy, given the claimant's residual functional capacity and age, education, and work history.

Sryock v. Heckler, 764 F.2d 834 (11th Cir. 1985).  If the Commissioner can demonstrate that there are such jobs claimant can perform, the claimant must prove inability to perform those jobs in order to be found disabled.  Jones v. Apfel, 190 F.3d 1224, 1228 (11th Cir. 1999). See also Hale v. Bowen, 831 F.2d 1007, 1011 (11th Cir. 1987) (citing Francis v. Heckler, 749 F.2d 1562, 1564 (11th Cir. 1985)).

### C.      Medical Evidence

On April 19, 1999, plaintiff was treated at the emergency department of Thomas Hospital. Plaintiff reported lower back pain for "approximately two weeks prior to arrival." (Tr. 138).  Plaintiff reported that his back pain has occasionally flared up following an injury five years earlier and polio as a child.  His physical examination was normal but for scoliosis, "marked bilateral paraspinal spasm"and an absent bilateral ankle jerk reflex.  Plaintiff had full range of motion of the lumbar spine, no tenderness and a negative straight leg raise test bilaterally.  He was diagnosed with lumbar strain and muscle spasm, given an intramuscular injection of pain medication and oral medication, and instructed to follow-up with an orthopedist in five to seven days.  He was also diagnosed with an elevated blood alcohol and advised not to drink alcohol with his pain medications. (Tr. 138).

In May 2000, plaintiff returned to the emergency room with complaints of lower back pain after falling from a porch.  He was in moderate distress and showed severe tenderness and severe spasm on physical examination.  He was given an intramuscular injection of pain medication which improved his pain, a prescription for a muscle relaxant and a pain medication, and advised to stay off work for two to three days. (Tr. 143).

On July 23, 1999, plaintiff was initially treated by Andrew A. Smith, M.D., a family

practitioner.  Plaintiff requested a complete physical examination and reported that he had not seen a doctor in fifteen years.  Dr. Smith noted plaintiff's report that he had no "significant medical problems" and "no real complaints". (Tr. 177).  Dr. Smith also noted plaintiff's report that he "occasionally has some back problems, but it has not given him trouble recently." (Tr. 177).  Dr. Smith recorded a past history of childhood polio and probable scoliosis and no hospitalizations. (Tr. 177).

On June 2, 2000, plaintiff returned to Dr. Smith with complaints of back pain following a fall from his porch.  On examination, Dr. Smith noted plaintiff's back was tender in the right  lower quadrant and his muscles were stiff and sore.  Dr. Smith diagnosed low back strain and prescribed a non-steroidal anti-inflammatory medication and a pain medication.  Plaintiff was scheduled to return in two weeks if he did not improve. (Tr. 176).

On July 27, 2000, plaintiff returned to the emergency room with complaints of a headache with weakness which occurred after a confrontation at work.  His physical examination was normal including a finding of no tenderness in his back, full range of motion in all extremities, equal tone and strength, no joint tenderness or effusion and intact sensory and motor functions.    He was diagnosed with headache, weakness and a stress reaction. (Tr. 145-146).

On July 6, 2001, plaintiff returned to the emergency room and reported thoracic back pain for the past several years but without tingling, numbness or weakness.  On physical examination, the doctor noted "[s]ome vertebral tenderness, normal skin. Without spasm. Bilateral straight leg raising negative." (Tr. 150).  The doctor also noted plaintiff's extremities were symmetrical with full range of motion, equal tone and strength, equal pulses bilaterally, normal reflexes, and no joint tenderness or effusion. He also noted that plaintiff's gait was normal and that his sensory and motor functions were intact.

10

Plaintiff was given intramuscular injections of two medications, diagnosed with back pain and discharged. (Tr. 150-151).

On December 11, 2001, plaintiff was consultatively examined by William A. Crotwell III, M.D., an orthopedic physician.  Plaintiff reported back and leg pain with swelling and numbness in his leg and an inability to sleep.  He also reported occasional numbness and tingling in both legs.  On physical examination, Dr. Crotwell noted

> Toe and heel walk normal, flexion 100, extension 70 with no tenderness or spasms, reflexes are +2 and equal in patella and achilles, sensory is normal, motor 5/5, straight leg raise sitting 90 right and left, lying 90 right and left with no back pain, calves measure 13 3/4 each, thighs 16" each, no sign to me of any motor weakness or any sign of any polio.

(Tr. 170).  Dr. Crotwell obtained an x-ray of plaintiff's lumbar spine which he interpreted as showing "some lumbar degenerative disc disease with sacralization of [the] L5." (Tr. 170).[8]  He found that plaintiff "could carry out medium, he could definitely carry out light and could definitely carry out sedentary, I find very little orthopaedic problem with this patient." (Tr. 170).

On December 13, 2001, Dr. Crotwell completed a physical capacities evaluation wherein he found plaintiff could sit for two hours at a time and for eight hours in an eight hour day, stand  for two hours at a time and for eight hours in an eight hour day, and walk for two hours at a time and for eight hours in an eight hour day.  He found plaintiff could continuously lift and carry up to twenty pounds, frequently lift and carry up to twenty-five pounds, occasionally lift and carry up to fifty pounds but never more.  He found plaintiff could use his hands for simple grasping, pushing - pulling arm controls and fine

---

[8] Sacralization is defined as a "[f]usion of L-5 to the first segment of the sacrum, so that the sacrum consists of six segments" and is known as Bertolotti syndrome. www.back.com.

manipulation, and was unlimited in the use of his legs for repetitive actions.  Dr. Crotwell found plaintiff

could continuously reach and frequently bend, squat, crawl, and climb.  Dr. Crotwell found plaintiff was

moderately restricted from exposure to unprotected heights and mildly restricted from exposure to

moving machinery and driving automotive equipment, but was otherwise unrestricted. (Tr. 171).

On February 9, 2002, plaintiff was treated at the emergency room with complaints of "lumbar

back pain approximately several weeks prior to arrival", pain radiating to his buttocks, and left leg

numbness for the past one and one-half years. (Tr. 190).  Plaintiff reported that he had "lifelong back

pain from polio" which will "[f]lair periodically." (Tr. 190).  On examination, the doctor noted "[s]ome

paravertebral tenderness[]with spasm" though the bilateral straight leg raise test was negative and there

was no point tenderness. (Tr. 190).  The doctor found plaintiff's extremities were symmetrical with full

range of motion, equal tone and strength, equal pulses bilaterally, and no joint swelling, tenderness or

effusion. (Tr. 190).  Plaintiff was given an injection of pain medication which reportedly relieved his

symptoms fairly well and he was discharged with a diagnosis of "contusion/sprain/chronic back pain"

(Tr. 190).  He was given a prescription for Norflex and Lortab. (Tr. 190).

On February 16, 2002, plaintiff was treated at the emergency room and reported that his hands

were shaking.  On physical examination, the doctor found no tenderness or spasm of the back.

Plaintiff's extremities were noted as symmetrical with full range of motion, equal tone and strength,

equal pulses bilaterally and no swelling, tenderness or effusion in the joints.  He did exhibit a tremor in

his hands.  Plaintiff was advised to cease taking one of his medications, begin taking Xanax, and follow

with Dr. Smith. (Tr. 188).

On February 22, 2002, plaintiff returned to Dr. Smith with complaints of low back pain and

pain in his left leg.  Dr. Smith noted plaintiff's report of back problems all of his life which have begun to

flare up more often.  On physical examination, Dr. Smith noted plaintiff had "mild soreness in the LS

region" with "a little scoliosis there as well" but his "[m]uscles and reflexes of his leg [were] normal."

(Tr. 176).  Dr. Smith ordered an MRI of plaintiff's lumbar spine.

On February 28, 2002, an MRI of plaintiff's lumbar spine was interpreted as showing a

"[p]rotrusion/small herniation of disc material at the L3-4 level on the right side with encroachment upon

the neural foramen" and "diffuse bulge of the annular material at the L4-5 level resulting in mild spinal

stenosis." (Tr. 174).

On March 29, 2002, plaintiff was initially examined by Robert L. White, M.D., neurologist.

Dr. White indicated that plaintiff was "poor historian"; however, he noted plaintiff's report of childhood

polio, low back pain, pain radiating into both legs, swelling and weakness in his legs, pain with walking,

restless legs at night, difficulty controlling his legs, and occasional nighttime hand numbness.  Plaintiff

reported taking Vioxx, Indocin, Lortab, Orphenadrine, and Xanax.[9]  He also reported drinking alcohol

occasionally and smoking a daily pack of cigarettes.  (Tr. 184).  On physical examination, Dr. White

found plaintiff's

> motor examination is normal throughout.  He has full lumbar range of motion with pain
> on extreme.  He has negative femoral stretching and negative sciatic stretching.  Hip
> rotations are relatively full and painless.  Reflexes are symmetric with reinforcement 1+
> at the patella, 1+ at the ankles.  Plantar responses are downgoing.  He has normal distal
> pulses in both feet.  There are no long tract signs.

---

[9] Vioxx and Indocin are a  non-steroidal anti-inflammatory medication for treatment of pain and
inflammation.  Lortab is a narcotic pain medication. Orphenadrine is a muscle relaxant used for treating
strains, sprains or other muscle injury.  Xanax is an anti-anxiety medication.
http://www.nlm.nih.gov/medlineplus/druginfo/

13

(Tr. 185).  Dr. White noted the results of plaintiff's past x-ray and MRI and ordered an MRI of

plaintiff's hips. (Tr. 185-186).  On April 2, 2002, the MRI of plaintiff's hips was interpreted as showing

"[m]inimal degenerative changes of both hip joints." (Tr. 172-173).

On June 21, 2002, Dr. White examined plaintiff and found normal muscle strength of 5/5

throughout the upper and lower extremities, absent Achilles reflex bilaterally, limited lumbar spine

flexion and extension due to pain, "loss of normal lumbar lordosis" and positive straight leg raise testing

bilaterally. He noted again that plaintiff was "still a poor historian." (Tr. 199).

Also, on June 21, 2002, Dr. White completed a physical capacities evaluation wherein he found

plaintiff could sit for one hour at a time and for six hours in an eight hour day, stand for one hour at a

time and for three hours in an eight hour day, and walk for one hour at a time and for three hours in an

eight hour day.  He found plaintiff could frequently lift and carry up to five pounds, occasionally lift and

carry up to ten pounds but never more than twenty-five pounds.  He found plaintiff could use his hands

for simple grasping, pushing - pulling arm controls and fine manipulation.  He found plaintiff could not

use his legs for repetitive actions.  Dr. White found plaintiff could occasionally reach but never bend,

squat, crawl, and climb.  Dr. White did not identify any environmental restrictions. (Tr. 194).  He noted

his diagnosis of lumbar disc disease at L3-4, lumbar stenosis at L4-5 and osteoarthritis of both hips.

(Tr. 194).

Also, on June 21, 2002, Dr. White completed a clinical assessment of pain form wherein he

found plaintiff's pain was distracting to adequate performance of daily activities or work and that

physical activity would increase pain to the degree that plaintiff would be distracted from or totally

abandon a task.  He also found that plaintiff's medication would cause some side effects but not enough

14

to create problems in most instances. (Tr. 196).

On June 26, 2002, plaintiff was referred by Dr. White to Patricia Boltz, M.D., a pain

management physician, for an epidural steroid injection. (Tr. 197).  The procedure was cancelled

because of plaintiff's elevated blood pressure.  Dr. Boltz noted plaintiff's report of childhood polio, pain

in his back and both legs, intermittent numbness and tingling but he denied acute weakness or bowel or

bladder problems.  Dr. Boltz also noted that plaintiff appeared "in no acute distress", was "alert,

awake, oriented time three", and his "[s]peech is fluent." (Tr. 198).  She also noted plaintiff's report

that he had smoked a pack of cigarettes each day for seventeen years and drank alcohol one or more

times per week. (Tr. 197).  Dr. Boltz noted that the MRI showed "a small herniated disc in the right at

L3-4 and bulge", "a possible herniation at L4-5" and "[m]ild spinal stenosis." (Tr. 198).  On physical

examination, Dr. Boltz found as follows:

> Patient's gait and station were within normal limits.  He was able to heel and toe walk
> without difficulty.  Strength is 5/5 in the upper and lower extremities, no evidence of any
> acute weakness.  Sensory is intact to light touch throughout.  Negative Patrick's and
> Gaenslen's maneuvers.  Negative straight leg raise.  Reflexes were +1 in the upper and
> lower extremities.  Normal distal pulses bilaterally in the lower extremities.

(Tr. 198).  Dr. Boltz assessed lumbar radiculopathy, lumbar degenerative disc disease, herniated

nucleus propulsus at L3-4 and lumbar stenosis.  (Tr. 198).

**D.      Plaintiff's Argument**

**1. Whether the Administrative Law Judge (ALJ) erred by refusing to recuse himself.**

**a) Recusal Motion**

Plaintiff argues that the ALJ in this case, Glay L. Maggard, failed to follow correct

procedure in addressing the plaintiff's motion for recusal.  Specifically, plaintiff states that the ALJ did

15

not, as required by the *Hearings, Appeals and Litigation Manual (*HALLEX*)* Chapter 1, §1-2-1-60,

advise plaintiff on the record at the beginning of the hearing of his reasons for refusing to recuse himself.

Instead, the ALJ cancelled the first hearing when counsel attempted to address the issue on the record.

Counsel states that the ALJ only issued an order, without specific reference to this case, wherein he

stated that plaintiff's request was defamatory and would not be treated as a motion for recusal. (Tr.

226).[10]

On January 8, 2002, plaintiff's counsel submitted a letter to ALJ Maggard requesting that he

recuse himself from all her cases.[11]  Counsel stated that the request was primarily based on her

experience employed as ALJ Maggard's law clerk from 1994-1999, where she observed a "prevailing

negative attitude about the claimants" which leads her to believe that her clients can not receive a fair

and impartial hearing before ALJ Maggard. (Tr. 224).  ALJ Maggard ordered that the letter not be

treated as a motion for recusal stating that it was not in proper form and did not specify a basis for

recusal. (Tr. 226).

If a plaintiff objects to the administrative law judge who will conduct the hearing, the plaintiff

must notify the administrative law judge at their earliest opportunity. The administrative law judge must

consider their objections and decide whether to proceed with the hearing or withdraw. 404 C.F.R. §

404.940.  If the administrative law judge does not withdraw, plaintiff may, after the hearing, present

objections to the Appeals Council as reasons why the hearing decision should be revised or a new

---

[10]  The order appears to address plaintiff's counsel's request that ALJ Glay L. Maggard recuse himself from all of her cases. (Tr. 226).

[11]Plaintiff's hearing was held July 17, 2002.

16

hearing held before another administrative law judge. *Id.* Although ALJ Maggard refused to consider plaintiff's request, it appears that plaintiff's counsel timely notified Maggard of her objection to him and specifically stated that it was based on an alleged general bias against claimants.

Furthermore, the record supports the plaintiff's contention that ALJ Maggard did not follow the proper procedure under HALLEX §1-2-1-60C, regarding addressing a motion for recusal. Specifically, HALLEX §1-2-1-60C provides that if an ALJ decides not to grant the recusal motion he should "advise the claimant in writing" and "note his or her refusal ... in the opening statement at the hearing". The HALLEX does not carry the authority of law. However, "where the rights of individuals are affected, an agency must follow its own procedures, even where the internal procedures are more rigorous than otherwise would be required.... Should an agency in its proceedings violate its rules and prejudice result, the proceedings are tainted and any actions resulting from the proceeding cannot stand." Hall v. Schweiker, 660 F.2d 116, 119 (5th Cir. 1981)(emphasis added).[12]   Accordingly, even assuming that plaintiff's objection was in proper form, plaintiff has failed to show any prejudice from ALJ Maggard's failure to follow the HALLEX.  Plaintiff has only alleged prejudice from the ALJ's refusal to recuse and not from the ALJ's noting his reasons on the record.   Thus, the failure to follow the HALLEX procedure does not in this instance support a reversal of the ALJ.

**b) Case Specific Bias**

---

[12]In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981)(en banc), the Eleventh Circuit adopted as precedent all decisions of the former United States Court of Appeals for the Fifth Circuit rendered prior to October 1, 1981.

Plaintiff also argues that the transcript of the hearing supports a finding of particularized bias by the ALJ against this claimant.  First the plaintiff points out that ALJ Maggard twice stated that plaintiff was evasive when plaintiff obviously had trouble with self-expression as documented in his social security records. (Tr. 84) Plaintiff also argues that the ALJ unfairly applied his own personal test for evaluating pain because he observed that plaintiff lacked discomfort during the hearing and gave weight to that observation. (Tr. 24).  Plaintiff states further that the ALJ unfairly misconstrued plaintiff's testimony regarding daily visits with his grandchildren to determine plaintiff could perform the role of caregiver to children and that his ability to do so did not support his allegations of pain.

The plaintiff submitted these allegations of particularized bias against the claimant to the Appeals Council. (Tr. 215-218) Although the Appeals Council stated that they were denying review of the claim (Tr. 6), the Appeals Council held as follows:

> The Appeals Council also considered your representative's contention that the Administrative Law Judge was biased and that you did not receive a fair and impartial hearing.  After a thorough review of the file and of the testimony at the hearing, the Appeals Council finds that the decision was based only on the medical record and is supported by substantial evidence.

(Tr. 7).

In regard to whether the ALJ's unfavorable decision was the product of bias in the present case, plaintiff argues that the ALJ's observation of plaintiff at the hearing indicates that he unfairly applied his own personal test for evaluating pain. (Tr. 24).  The ALJ found as follows:

> Another factor influencing the conclusions reached in this decision is the claimant's generally unpersuasive appearance and demeanor while testifying at the hearing.  It is emphasized that this observation is only one among many being relied on in reaching a conclusion regarding the credibility of the claimant's allegations and his residual functional capacity.  The claimant betrayed no *credible* evidence of pain or discomfort

18

while testifying at the hearing.  While the hearing was short-lived and cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis, the apparent lack of discomfort during the hearing is given some weight in reaching the conclusion regarding the credibility of the claimant's allegations and his residual functional capacity.

(Tr. 24).  The undersigned acknowledges that "'sit and squirm' jurisprudence has no place in this circuit." McRoberts v. Bowen, 841 F.2d 1077, 1081 (11th Cir. 1988) citing Johns v. Bowen, 821 F.2d 551, 557 (11th Cir.1987).  However, the ALJ's observations do not indicate the application of a personal test or bias against the plaintiff but rather a report of observations made in performance of his obligation to determine plaintiff's credibility.  Simply because the ALJ did not believe that plaintiff suffered chronic disabling pain based in part on his appearance and demeanor at the hearing does not mean that the ALJ was biased against the plaintiff.[13]  The ALJ did not find plaintiff was totally pain free or his testimony without any credibility, but instead he found plaintiff experienced some pain and symptoms but his assertions regarding his symptoms and functional restrictions were "not credible as to a disabling impairment." (Tr. 25, 28).

The ALJ admitted that his observations constituted only one segment in a series of reasons why he decided plaintiff's subjective complaints were not fully credible and gave his observations only "some weight." (Tr. 24).  The ALJ acknowledged that the hearing was short and that plaintiff's

---

[13]  In the reply to defendant's supplemental brief, plaintiff argues that because the ALJ did not mention that plaintiff had to stand to relieve pain during his testimony he ignored evidence favorable to plaintiff and thus was biased.  The ALJ stated that the "claimant betrayed no *credible* evidence of pain or discomfort while testifying at the hearing." (Tr. 24).  He also stated that "the apparent lack of discomfort during the hearing is given some weight in reaching the conclusion regarding the credibility of the claimant's allegations and his residual functional capacity." (Tr. 24).   It appears that the ALJ observed plaintiff and found that the evidence of pain or discomfort displayed while testifying, e.g., standing, was not credible.

behavior "cannot be considered a conclusive indicator of the claimant's overall level of pain on a day-to-day basis". (Tr. 24).  The ALJ set forth specific reasons to discredit plaintiff's testimony of chronic disabling pain and his demeanor at the hearing was one reason among several and not an example of bias or of the ALJ setting his own standards and then determining whether plaintiff met them. (Tr. 24-25) See Brown v. Sullivan, 921 F.2d 1233, 1236 (11th Cir. 1991) (if an ALJ decides to discredit a claimant's testimony, the ALJ must do so explicitly and articulate explicit and adequate reasons in support of that decision).  Moreover, "[t]he credibility of witnesses is for the [Commissioner] to determine, not the courts." Carnes v. Sullivan, 936 F.2d 1215, 1219 (11th Cir. 1991) citing Kelly v. Heckler, 736 F.2d 631, 632 (11th Cir.1984).

Plaintiff also argues that the ALJ was biased because he referred to plaintiff as "evasive" when actually plaintiff has documented difficulty with self-expression (Tr. 84) and was a slow learner.  Again, simply because the ALJ thought plaintiff was evasive does not mean that the ALJ was biased against the plaintiff.  In assessing plaintiff's credibility, the ALJ states as follows:

> Furthermore, the undersigned emphasizes the claimant's overall evasive behavior in answering questions during the hearing.  The [ALJ] posed only simple questions to the claimant (e.g., how many times Dr. White examined him, how his condition affects his ability to lift, stand, walk, etc.) but the claimant continuously evaded directly answering such questions and had a difficult time explaining just how his impairments limit his functional capacity.  This behavior is consistent with the claimant['s] own treatment history, where he has been labeled a "poor historian" on more than one occasion. [(Tr. 184, 199)].

(Tr. 24).[14]

---

[14]  Defendant points out in her proposed report and recommendation that plaintiff testified that he could read, write, count, and make change and that he had served in the military. (Tr. 270-271). Plaintiff testified that he spent three or four years in the Army. (Tr. 271).

Following these findings, the ALJ listed additional reasons based upon plaintiff's medical treatment records for deciding that plaintiff's allegations of disabling symptoms were not fully credible. The ALJ noted that while plaintiff's MRI showed osteoarthritis and lumbar degenerative disc disease with encroachment on the neural foramen, plaintiff "has denied numbness, tingling, abdominal discomfort, bowel/bladder dysfunction and weakness." (Tr. 25).    The ALJ also noted that plaintiff's "strength, ability to heel/toe walk, sensory functioning and neurological functioning has consistently been found intact", his "range of motion has not been found to be significantly impaired, even in his lumbar spine, in which he complained of pain only on extreme motion", and that "[a]ll but one of the claimant's straight leg raise tests have proven negative for pain and he has generally responded to prescription medication in terms of his pain lessening." (Tr. 25).  The ALJ also noted that the medical records did not support Dr. White's finding regarding medication side effects and that plaintiff's pain had been treated "only with medication, and he has not been referred for surgical intervention." (Tr. 25).  The ALJ's findings are supported by the medical evidence. [15]

_____

[15]  On two occasions, plaintiff did not exhibit an Achilles tendon reflex (Tr. 138, 199). However, the other examination reports have shown all reflexes intact. (Tr. 150, 170, 176, 185, 198). Additionally, the examining physicians have not reported any muscle atrophy or reduction in strength and sensation.  Plaintiff had one positive straight leg raise test. (Tr. 199).  All other test results have been negative including two other tests performed by Dr. White. (Tr. 138, 170, 190, 198).  Plaintiff has received pain injections at the emergency room on only four occasions over the course of three years. (Tr. April 1999 (Tr. 138); May 2000 (Tr. 143); July 2001 (Tr. 150-151); February 2002 (Tr. 190)). Additionally, at the February 9, 2002 emergency room visit, plaintiff reported that he had "lifelong back pain from polio" which will "[f]lair periodically." (Tr. 190).  Also, when plaintiff was initially treated by Dr. Smith, in July 1999, he reported no "significant medical problems" and "no real complaints" and he "occasionally has some back problems, but it has not given him trouble recently." (Tr. 177).  Plaintiff did not return to Dr. Smith until June 2, 2000, when he complained of  back pain following a fall from his porch. (Tr. 176).  Moreover, in June 2002, when Dr. Boltz, the pain management neurologist, examined plaintiff she noted that the MRI showed "a small herniated disc in the right at L3-4 and

Plaintiff also argues that the ALJ unfairly misconstrued plaintiff's testimony regarding his activities with his grandchildren.  When asked if he looked after his four grandchildren, he responded that "[to] be honest with you, they look out for me." (Tr. 272).  He testified that three of his grandchildren were two, five and seven years old. (Tr. 272).  When asked how he spent time during the day, plaintiff responded "[m]ainly sitting, getting up walking.  Just trying to stay mobile for a little bit if I can.  And looking out for my little grandbabies." (Tr. 273).

In reviewing plaintiff's allegations regarding his activities of daily living, the ALJ found as follows:

> The [ALJ] also notes that the claimant testified he cares for his grandchildren during the day, a task which is very demanding both physically and emotionally.  The claimant's apparent ability to perform this activity with minimal difficulty does not substantiate his allegations of debilitating pain that are present in the record.

(Tr. 24).  The ALJ then included this finding among the others previously discussed upon which he relied to find plaintiff was not fully credible. (Tr. 24-25, 28).  When making a credibility determination, the ALJ may consider plaintiff's daily activities.  Macia v. Bowen, 829 F. 2d 1009, 1012 (11th Cir.

---

bulge", "a possible herniation at L4-5" and "[m]ild spinal stenosis." (Tr. 198).  However, on physical examination, she found as follows:

> Patient's gait and station were within normal limits.  He was able to heel and toe walk without difficulty.  Strength is 5/5 in the upper and lower extremities, no evidence of any acute weakness.  Sensory is intact to light touch throughout.  Negative Patrick's and Gaenslen's maneuvers.  Negative straight leg raise.  Reflexes were +1 in the upper and lower extremities.  Normal distal pulses bilaterally in the lower extremities.

(Tr. 198).  Thus, even though plaintiff may have "mild spinal stenosis" and a "small herniated disc", he did not exhibit any symptomatology but for his pain complaints.

Plaintiff's treatment records indicate no reports from him that his medication cause disabling side effects.  On one occasion plaintiff went to the emergency room with complaints that his hands were shaking.  He thought this might be related to his pain medication and his medications were changed. (Tr. 188).  There were no further reports of plaintiff's hands shaking.

1987); see also 20 C.F.R. § 404.1529(c)(3)(i); 416.929(c)(3)(i) ("Factors relevant to your symptoms,

such as pain, which we will consider include: (i) Your daily activities[.]").  Thus, the ALJ was within the

parameters of his duty to consider and weigh the evidence presented.  Wolfe v. Chater, 86 F.3d 1072,

1079 (11th Cir. 1996) citing Powers v. Heckler, 738 F.2d 1151, 1152 (11th Cir.1984) (per curiam)

("The ALJ's task is to examine the evidence and resolve conflicting reports."); Grant v. Richardson,

445 F.2d 656 (5th Cir.1971) (per curiam) ("Moreover, the resolution of any conflict in the evidence, . .

. and the determination of questions of credibility of the witnesses are not for the court; such functions

are solely within the province of the Secretary.").  The ALJ interpreted plaintiff's testimony regarding

his attention to the grandchildren to mean that he cared for them.  Admittedly, the precise degree of his

responsibilities was not developed.  However, it is not unreasonable to interpret the phrase to mean

plaintiff engaged in some degree of caregiving for his three grandchildren.

Based upon the foregoing, the undersigned finds that Appeals Council correctly determined that

in the present case, the ALJ did not exhibit a bias or prejudice toward the plaintiff.  The undersigned

finds that the Appeals Council's decision was based on substantial evidence in the record.  As

discussed previously, the ALJ's findings regarding plaintiff's evasiveness, demeanor at the hearing, and

interaction with his grandchildren were made as part of the ALJ's obligation to determine plaintiff's

credibility.

### c) Generalized Bias

Plaintiff also argues that ALJ Maggard, has a generalized bias against social security claimants

which precludes him from issuing fair and impartial decisions, thus the ALJ violated plaintiff's due

process rights to a decision free from bias and prejudice.  In support of this argument plaintiff's counsel restates information that she submitted to the Appeals Counsel regarding her personal knowledge of the ALJ's alleged bias. (Tr. 220).  Counsel states that she worked for ALJ Maggard at the Office of Hearings and Appeals from 1994-1999 and observed his bias to claimants first hand.  Plaintiff's counsel states that the ALJ was biased against claimants and would request that she "find a way" to deny the case even when the claimant had presented credible arguments.  Plaintiff's counsel also states that the ALJ did not believe in some medical impairments such as chronic fatigue syndrome and fibromyalgia.  Plaintiff's counsel states her observation that the ALJ allowed his dislike for certain attorneys who appeared before him to taint his decision making.  In conclusion, plaintiff asserts that the Commissioner, i.e. the Appeals Council, failed to properly address the issue of generalized bias and that substantial evidence does not support the conclusion that the ALJ is not biased.

Plaintiff requested that the Appeals Council consider the issue of the ALJ's generalized bias. (Tr. 215-219).[16]   By letter to the Appeals Council, plaintiff's counsel stated that the ALJ's attitude toward Social Security claimant's "affected his ability to make fair and impartial decisions based on the evidence of record". (Tr. 220).  Counsel also identified specific examples of bias which she witnessed as an employee of the ALJ at the Office of Hearings and Appeals and also cited specific cases in which she believed the ALJ acted with bias. (Tr. 220-223).  The Appeals Council stated that they considered,

---

[16] By separate letter, plaintiff's counsel also appealed the ALJ's refusal to recuse himself from all of her cases. (Tr. 224-225 - letter to the ALJ asking him to recuse himself from all of plaintiff's counsel's cases; Tr. 226 - ALJ's order denying the request; Tr. 220-223 - letter to Appeals Council). In one of plaintiff's counsel's other cases, this ALJ recused himself after plaintiff's counsel wrote a letter to him asking him to recuse himself from all her cases. (Tr. 224, 227-228).

inter alia, the "various attached letters and memoranda" which includes counsel's letter outlining her observations of the ALJ's bias. (Tr. 6, 9).  The Appeals Council then held as follows:

> The Appeals Council also considered your representative's contention that the Administrative Law Judge was biased and that you did not receive a fair and impartial hearing.  After a thorough review of the file and of the testimony at the hearing, the Appeals Council finds that the decision was based only on the medical record and is supported by substantial evidence.

(Tr. 7).

In sum, as evidence of a general bias, plaintiff's counsel offered her conversations and work-related interaction with the ALJ and the ALJ's refusal to recuse himself from all of her cases after she requested he do so.  Based on this information the Appeals Council did not find a generalized bias by the ALJ against all claimants.

In Miles v. Chater, 84 F. 3d 1397 (11th Cir. 1996), the court addressed the issue of ALJ bias and stated as follows:

> The Social Security Act "contemplates that disability hearings will be individualized determinations based on evidence adduced at a hearing." Heckler v. Campbell, 461 U.S. 458, 467, 103 S.Ct. 1952, 1957, 76 L.Ed.2d 66, 74 (1983). A claimant is entitled to a hearing that is both full and fair. Clark v. Schweiker, 652 F.2d 399, 404 (5th Cir.1981). [footnote omitted]  The regulations governing Title II dictate that "[a]n administrative law judge shall not conduct a hearing if he or she is prejudiced or partial with respect to any party or has any interest in the matter pending for decision." 20 C.F.R. § 404.940....
>
> The ALJ plays a crucial role in the disability review process. Not only is he duty-bound to develop a full and fair record, he must carefully weigh the evidence, giving individualized consideration to each claim that comes before him. Because of the deferential standard of review applied to his decision-making, the ALJ's resolution will usually be the final word on a claimant's entitlement to benefits. The impartiality of the ALJ is thus integral to the integrity of the system. See Johnson v. Mississippi, 403 U.S. 212, 216, 91 S.Ct. 1778, 1780, 29 L.Ed.2d 423, 427 (1971) (citations omitted) ("Trial before 'an unbiased judge' is essential to due process.").

25

*Id.* at 1400.

An allegation that an ALJ is biased against all claimants is a very serious allegation and if true would certainly be grounds for removal of the ALJ from all cases.  However, the Court must presume that the ALJ is unbiased.  See Schweiker v. McClure, 456 U.S. 188, 195-196 (1982). "This presumption can be rebutted by a showing of conflict of interest or some other specific reason for disqualification.... [T]he burden of establishing a disqualifying interest rests on the party making the assertion." *Id.*   In this case counsel presented evidence to the Appeals Council that purports to show that ALJ Maggard is incapable of making fair and impartial decisions based on the record.   However, the Appeals Council did not find that the evidence was sufficient to show a generalized bias.  The undersigned agrees that plaintiff has not presented evidence which warrants a finding that ALJ Maggard is generally biased against claimants.  Rather, the evidence presented appears to support only a finding that hostility exists between plaintiff's counsel and the ALJ and that plaintiff's counsel when in the employ of the ALJ often disagreed with the ALJ's determinations.  Accordingly, the plaintiff has failed to establish that his due process rights were violated based on the ALJ's alleged bias against all claimants.

**2. Whether the ALJ erred by giving more weight to the opinion of the consultative physician than to the opinion of plaintiff's treating physician.**

Plaintiff argues that the ALJ erred by giving greater weight to the opinion of the  consultative orthopedic physician, Dr. Crotwell (Tr. 171), than to the opinion of plaintiff's treating neurologist, Dr. White, as expressed in his physical capacities evaluation and his clinical assessment of pain. (Tr. 194-

196).  Plaintiff argues that by so doing, the ALJ did not function as an impartial decision-maker but instead substituted his own evaluation of the medical evidence for that of Dr. White and thus, erroneously concluded plaintiff had the residual functional capacity for medium exertional work. Plaintiff also argues that the ALJ erred by giving determinative weight to the opinion of Dr. Crotwell because he was a one-time consultative examiner who did not have the opportunity to review the MRI results. (Dr. Crotwell examined plaintiff on December 13, 2001. (Tr. 170-171).  The MRI was obtained in February 2002.[17] (Tr. 174).)

After discussion of the medical evidence and a determination regarding plaintiff's credibility and residual functional capacity, the ALJ gave "determinative weight to the opinion of Dr. Crotwell, a board certified orthopedist, who fully examined the claimant and provided an objective assessment of the claimant's physical capacity considering his musculoskeletal disease." (Tr. 25).  The ALJ also stated that in

> making this decision [that plaintiff can perform medium work], the [ALJ] has fully considered the physical capacity assessment and pain questionnaire completed by Dr. White.  The undersigned is aware that Dr. White is a treating physician, but emphasizes the fact that Dr. White does not have a lengthy treatment history with the claimant and has instead referred him to an orthopedic specialist for additional attention.  The reports of treating physicians are particularly valuable when the treatment has extended over a *considerable* period of time. . . .  The [ALJ] also stresses that Dr. White's opinion is contradicted not only by his own treatment notes, but the examinations performed by Dr. Crotwell and other treating physicians.  Dr. White opined that the claimant could not perform even sedentary work, yet on two occasions found the claimant's strength to be normal, his neurological functioning to be intact and indicated in March 2002 that

---

[17] The MRI of plaintiff's lumbar spine was obtained on February 28, 2002, and was interpreted as showing a "[p]rotrusion/small herniation of disc material at the L3-4 level on the right side with encroachment upon the neural foramen" and "diffuse bulge of the annular material at the L4-5 level resulting in mild spinal stenosis." (Tr. 174).

the claimant's range of motion was unlimited, save for extreme motion in the lumbar spine. . . . Generally, the more consistent an opinion is with the record as a whole, the more weight it will be afforded. (20 C.F.R. §§ 404.1527(d)(4) and 416.927(d)(4)). A treating physician's opinion may also be discounted if it is inconsistent with his own office notes and medical records [citation omitted], or if it is based on the self-report of a claimant with poor credibility. [citation omitted] Based on all these facts, and since Dr. Crotwell's opinion is more consistent with the record as a whole, the undersigned finds that Dr. Crotwell's opinion is entitled to controlling weight.

(Tr. 26).

Generally, the opinion of a treating physician must be given substantial weight, or credit, unless "good cause" is shown to the contrary. See Lewis v. Callahan, 125 F. 3d 1436, 1440 (11th Cir. 1997); Hillsman v. Bowen, 804 F.2d 1179, 1181 (11th Cir. 1986). However, an ALJ may properly discount the opinion of a treating physician if the opinion is conclusory, inconsistent with their own medical records, or if the evidence supports a contrary finding. See Edwards v. Sullivan, 937 F.2d 580 (11th Cir. 1991) (citing Schnorr v. Bowen, 816 F.2d 578, 582 (11th Cir. 1987)); Lewis, 125 F.3d at 1440; see also 20 C.F.R. § 404.1527(c)(2)(if medical evidence is internally inconsistent, the Commissioner may weigh all the evidence and make a decision if he can do so on the available evidence); § 404.1527(d)(4) (generally, the more consistent an opinion with the record as a whole, the greater weight it will be given). If the ALJ discounts the opinion of a treating physician, the ALJ must clearly articulate the reasons. Marbury v. Sullivan, 957 F. 2d 837, 841 (11th Cir. 1992) (per curiam); Hale v. Bowen, 831 F.2d 1007, 1012 (11th Cir. 1987). Also, the reasons must be legally correct and supported by substantial evidence in the record. Lamb v. Bowen, 847 F.2d 698, 703 (11th Cir.1988); Hale, 831 F.2d at 1012.

Initially, the court agrees with the ALJ's finding that plaintiff does not have a lengthy treating

relationship with Dr. White and notes that plaintiff saw Dr. White on two occasions prior to the

completion of the physical capacities evaluation and pain assessment: March 2002 and June 2002.  At

that point, Dr. White was barely more than a one-time consultative examiner.  See McSwain v. Bowen,

814 F.2d 617, 619 (11th Cir. 1987)(a one-time examiner is not a treating physician); 20 C.F.R. §

404.1527 (d)(2) (2000); 20 C.F.R. § 416.927(d)(2) (2000) ("Generally, we give more weight to

opinions from your treating sources, since these sources are likely to be  the medical professionals most

able to provide a detailed, longitudinal picture of your medical  impairment(s) and may bring a unique

perspective to the medical evidence that cannot be obtained from the objective medical findings alone

or from reports of individual examinations, such as consultative examinations or brief

hospitalizations.").[18]  Accordingly, the undersigned finds no error with the ALJ's decision to give less

than controlling weight to Dr. White's opinion as a "treating" physician.

     The court further finds that the ALJ set forth specific and adequate reasons for rejecting Dr.

White's opinions and those reasons are supported by substantial evidence.  As the ALJ discussed, Dr.

White's initial examination showed normal strength, neurological functioning and  range of motion but

for some limit on extreme range of spinal motion.  Also, as previously discussed, Dr. White found a

positive straight leg test on only one occasion at the time that the  physical capacities evaluation and

pain assessment were prepared.  At the initial evaluation on March 29, 2002, Dr. White found as

follows:

---

[18]  The regulations also provide that if a treating source is not a treating physician the ALJ
should consider the "[l]ength of the treatment relationship and the frequency of examination" and the
"[n]ature and extent of the treatment relationship".  Id. at (d)(2)(i) & (ii).

> [plaintiff's]motor examination is normal throughout.  He has full lumbar range of motion
> with pain on extreme.  He has negative femoral stretching and negative sciatic
> stretching.  Hip rotations are relatively full and painless.  Reflexes are symmetric with
> reinforcement 1+ at the patella, 1+ at the ankles.  Plantar responses are downgoing.
> He has normal distal pulses in both feet.  There are no long tract signs.

(Tr. 185).   At the second examination in June 2002 when the significantly restrictive evaluations were

prepared, Dr. White found normal muscle strength in plaintiff's lower extremities, absent Achilles reflex

bilaterally, limited lumbar spine flexion and extension due to pain, "loss of normal lumbar lordosis" and

positive straight leg raise testing bilaterally. (Tr. 199)  However, at the next medical visit with Dr. Boltz

on June 26, 2002, she observed that plaintiff's

> gait and station were within normal limits.  He was able to heel and toe walk without
> difficulty.  Strength is 5/5 in the upper and lower extremities, no evidence of any acute
> weakness.  Sensory is intact to light touch throughout.  Negative Patrick's and
> Gaenslen's maneuvers.  Negative straight leg raise.  Reflexes were +1 in the upper and
> lower extremities.  Normal distal pulses bilaterally in the lower extremities.

(Tr. 198).

    The ALJ also found that Dr. Crotwell's opinion was more consistent with the record as a whole

and thus entitled to controlling weight.  The undersigned finds no error with the ALJ's decision.  The

findings of the emergency room physicians, the findings of Dr. Smith, and the examination report from

Dr. Boltz generally support the results of  Dr. Crotwell's physical examination upon which he based his

opinion regarding plaintiff's ability to work.[19]  The most contradictory evidence exists in the second

physical examination report from Dr. White. (Tr. 199)  However, as previously discussed, Dr. Boltz,

---

[19]  In April 1999, the emergency room physician diagnosed lumbar strain and muscle spasm
and found an absent Achilles tendon reflex but straight leg raising was negative. (Tr. 138).  In 2000,
after a fall from a porch, plaintiff was reported in moderate distress and showed severe tenderness and
severe spasm on physical examination. (Tr. 143).

less than one week later, made different findings regarding plaintiff's Achilles tendon reflex and straight leg testing which did not support Dr. White's assessment.  (Tr. 198; see also footnote 15).

Also, plaintiff argues that Dr. Crotwell's opinion should not be given determinative weight because he did not review the MRI results.  However, the post-MRI physical examination performed by the neurologist, Dr. Boltz[20] indicate plaintiff maintained substantially the same physical capacities as those identified by Dr. Crotwell.[21]  Also, Dr. Crotwell did review an x-ray of plaintiff's lumbar spine which he interpreted as showing "some lumbar degenerative disc disease with sacralization of [the] L5." (Tr. 170).  Thus, while he may not have been aware of the detailed report from the MRI, he was aware that plaintiff had lumbar degenerative disc disease.   Additionally, as discussed above the initial physical examination by Dr. White which was made after the MRI also indicated substantially the same findings as did Dr. Boltz and Dr. Crotwell.  Only Dr. White's second examination in June 2002, indicated the

---

[20] On physical examination, Dr. Boltz found as follows:

Patient's gait and station were within normal limits.  He was able to heel and toe walk without difficulty.  Strength is 5/5 in the upper and lower extremities, no evidence of any acute weakness.  Sensory is intact to light touch throughout.  Negative Patrick's and Gaenslen's maneuvers.  Negative straight leg raise.  Reflexes were +1 in the upper and lower extremities.  Normal distal pulses bilaterally in the lower extremities.

(Tr. 198).

[21] On physical examination, Dr. Crotwell noted

Toe and heel walk normal, flexion 100, extension 70 with no tenderness or spasms, reflexes are +2 and equal in patella and achilles, sensory is normal, motor 5/5, straight leg raise sitting 90 right and left, lying 90 right and left with no back pain, calves measure 13 3/4 each, thighs 16" each, no sign to me of any motor weakness or any sign of any polio.

(Tr. 170).

clinical findings of an absent  Achilles tendon reflex and positive straight leg raise testing.  However,

even then, he still identified normal muscle strength of 5/5 throughout the upper and lower extremities.

(Tr. 199).

In consideration of the foregoing, the undersigned finds that substantial evidence in the record,

including the clinical examination reports and objective medical tests support the ALJ's decision to give

determinative weight to Dr. Crotwell.


**3. Whether the ALJ erred by concluding plaintiff could return to his past relevant work as a custodian without making specific findings regarding the physical and mental demands of this work as required by Social Security Ruling 82-62.**

Plaintiff argues that the ALJ erred by failing to obtain a detailed analysis of plaintiff's job duties

for his past relevant work as a janitor before finding that plaintiff could return to his past relevant work.

Plaintiff points out that the ALJ did not inquire into the duties of plaintiff's past relevant work as he

actually performed the job and did not ask the VE to identify the job duties as the job is performed in

the general labor force.

In regard to plaintiff's ability to return to his past relevant work, the ALJ stated that to assist in

determining whether plaintiff could perform his past relevant work he obtained the testimony of a

vocational expert.  The ALJ then stated that the VE identified plaintiff's past work as a custodian as

medium unskilled work and that he presented a hypothetical question to the VE which included a

younger individual with a limited education and the residual functional capacity for medium work which

does not require more than occasional operation of automobile equipment and does not require

concentrated exposure to unprotected heights or moving machinery. (Tr. 26).[22]   The ALJ then stated

that in response to the hypothetical question the VE "testified that such an individual could at the least

perform the demands of a custodian." (Tr. 26, 280).  Relying upon the VE's response to the

hypothetical question, the ALJ found that based upon the VE's testimony and the record as a whole,

the plaintiff could return to his past relevant work. (Tr. 26-27).  The ALJ next reiterated that "the

claimant's testimony cannot be accepted as fully credible as the medical evidence does not fully

substantiate his allegations." (Tr. 27).

In regard to developing the record of plaintiff's past relevant work, Social Security Ruling 82-

62: Titles II and XVI: A Disability Claimant's Capacity to Do Past Relevant Work, In General, 1982

WL 31386, sets forth, in part, as follows:

> The RFC to meet the physical and mental demands of jobs a claimant has performed in
> the past (either the specific job a claimant performed or the same kind of work as it is
> customarily performed throughout the economy) is generally a sufficient basis for a
> finding of "not disabled." . . .

> The claimant is the primary source for vocational documentation, and statements by the
> claimant regarding past work are generally sufficient for determining the skill level;
> exertional demands and nonexertional demands of such work. Determination of the
> claimant's ability to do PRW requires a careful appraisal of (1) the individual's
> statements as to which past work requirements can no longer be met and the reason(s)
> for his or her inability to meet those requirements; (2) medical evidence establishing
> how the impairment limits ability to meet the physical and mental requirements of the
> work; and (3) in some cases, supplementary or corroborative information from other
> sources such as employers, the Dictionary of Occupational Titles, etc., on the

---

[22] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or
carrying of objects weighing up to 25 pounds.  If someone can do medium work, we determine that he
or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c); 20 C.F.R. § 416.967(c).

requirements of the work as generally performed in the economy.
. . .

Sufficient documentation will be obtained to support the decision. Any case requiring consideration of PRW will contain enough information on past work to permit a decision as to the individual's ability to return to such past work (or to do other work).

Adequate documentation of past work includes factual information about those work demands which have a bearing on the medically established limitations.  Detailed information about strength, endurance, manipulative ability, mental demands and other job requirements must be obtained as appropriate. This information will be derived from a detailed description of the work obtained from the claimant, employer, or other informed source.

Id. at *3.  The regulation gives a general overview of the process by which an ALJ may determine whether a person can return to past relevant work either as the work was performed by the claimant or as it is generally performed in the national economy.  The ruling also states that detailed information must be obtained as appropriate from the claimant, an employer or other source.

The ALJ did not delineate the actual job duties of a custodian and did not make any findings of the basic work activities required to perform this work in his decision.  However, plaintiff completed a disability report wherein he described his job duties as sweeping, vacuuming, mopping and waxing floors. (Tr. 91).  Plaintiff also reported that he worked at a nursing home as a "floor man", that he "did floor" and marked that he used equipment. (Tr. 112).  The VE stated that he had reviewed the exhibits file which includes these reports and testified that custodial work was unskilled medium exertional work. (Tr. 279-280).  Moreover, at the hearing after the VE testified in regard to the skill and exertional levels of plaintiff's past work, the ALJ asked plaintiff whether the VE "correctly stated your past work". (Tr. 281).  Plaintiff responded "Yes, sir, he did." (Tr. 281).

The undersigned finds that the ALJ did not commit error and that substantial evidence in the

34

record supports his finding that plaintiff could return to his past relevant work.  Specifically, the ALJ

relied upon the testimony of the VE who reviewed the records, heard the testimony and offered his

opinion that the past relevant work was medium unskilled work.  Also, the ruling does not require that

the ALJ obtain a detailed functional analysis of the work of a custodian.  Instead, the ruling states that a

detailed analysis should be obtained "as appropriate." Id. at *3.


**4.  Whether the ALJ erred by relying on the vocational expert's response to an incomplete hypothetical question.**

Plaintiff argues that the VE's response to the ALJ's incomplete hypothetical questions cannot

constitute substantial evidence upon which the ALJ may rely in making his determination. Plaintiff argues

that the first hypothetical question which was based upon the physical capacities evaluation prepared by

Dr. Crotwell can not constitute substantial evidence because Dr. Crotwell had not reviewed all the

medical evidence, primarily plaintiff's MRI results.  Plaintiff argues that the second hypothetical question

was based on the ALJ's personal assessment of plaintiff's physical capacities and was not supported by

the objective medical evidence.  Plaintiff also argues that his non-exertional impairments  - pain,

weakness and a mental limitation - were not included in the second hypothetical question.

If plaintiff has the residual functional capacity to meet the exertional and non-exertional

demands of work performed in the past then he is considered able to perform past relevant work and

therefore, not disabled. 20 C.F.R. § 416.960; 20 C.F.R. § 404.1560.  Even though VE testimony is

not necessary at step four of the sequential evaluation process, Lucas v. Sullivan, 918 F. 2d 1567,

1573 n. 2 (11th  Cir. 1990), the ALJ is not precluded from relying upon the testimony of the VE to

determine "whether the claimant can perform [her] past relevant work . . . based upon hypothetical questions about the claimant's abilities in spite of [her] impairments. [However,] '[i]n order for a vocational expert's testimony to constitute substantial evidence, the ALJ must pose a hypothetical question which comprises all of the claimant's impairments.'" Pritchett v. Barnhart, 288 F. Supp.2d 1224 (N.D. Ala. 2003) quoting Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir.1999).  Thus, whether at step four or step five of the sequential evaluation process, if an ALJ relies upon a hypothetical question to constitute substantial evidence to support the ALJ's determination, then the elements of the hypothetical question must comprehensively describe all of plaintiff's functional limitations and be supported by substantial evidence. Welch v. Bowen, 854 F.2d 436, 440 (11th Cir. 1986); McSwain v. Bowen, 814 F. 2d 617, 619-620 (11th Cir. 1986); Pendley v. Heckler, 767 F.2d 1561, 1562-1562 (11th Cir. 1985); Graham v. Bowen, 790 F.2d 1572, 1573 (11th Cir. 1986); see also Cowart v. Schweiker, 662 F.2d 731, 736 (11th Cir.1981)( "Although there is no per se rule that a vocational expert be called to testify ... the ALJ must articulate specific jobs that the claimant is able to perform, and this finding must be supported by substantial evidence, not 'mere intuition or conjecture by the administrative law judge.'")

In making his decision at step four and his alternative finding at step five, the ALJ relied upon the first hypothetical question which was based upon the physical capacities evaluation prepared by Dr. Crotwell.  The undersigned has previously found that the ALJ's decision to give controlling weight to the opinion of Dr. Crotwell was supported by substantial evidence in the record and that the physical capacities evaluation and pain assessment prepared by Dr. White were not entitled to determinative weight.  Thus, the VE's response to the hypothetical question based upon Dr. Crotwell's physical

36

capacities evaluation constitutes substantial evidence upon which the ALJ may conclude that plaintiff

can return to his past relevant.

When the VE was presented with a hypothetical question containing all of plaintiff's

impairments which were supported by substantial evidence in the record, the VE responded that the

hypothetical person was capable of performing plaintiff's past relevant work as a custodian and the

jobs of hand packager, cleaning employee, food assembler, assembler and bench work. (Tr. 27, 282-

283). Accordingly, the undersigned finds that the ALJ did not err by finding plaintiff could perform his

past relevant work or finding that plaintiff could perform other work which exists in significant numbers

in the national economy.


**VIII.   <u>Conclusion</u>**

For the reasons set forth, and upon consideration of the administrative record, the memoranda

of the parties, and oral argument, it is recommended that the decision of the Commissioner of Social

Security denying plaintiff's claim for Social Security disability insurance benefits and supplemental

security income be **AFFIRMED.**

The attached sheet contains important information regarding objections to this <u>report and</u>

<u>recommendation.</u>

**DONE** this the 23rd  day of June, 2005.


<u>s / Kristi  D.  Lee</u>
**KRISTI   D.  LEE**
**UNITED STATES MAGISTRATE JUDGE**

**MAGISTRATE JUDGE'S EXPLANATION OF PROCEDURAL RIGHTS
AND RESPONSIBILITIES FOLLOWING RECOMMENDATION
AND FINDINGS CONCERNING NEED FOR TRANSCRIPT**

1.      **Objection**.  Any party who objects to this recommendation or anything in it must, within ten days of the date of service of this document, file specific written objections with the clerk of court.  Failure to do so will bar a *de novo* determination by the district judge of anything in the recommendation and will bar an attack, on appeal, of the factual findings of the magistrate judge.  See 28 U.S.C. § 636(b)(1)(C); Lewis v. Smith, 855 F.2d 736, 738 (11th Cir. 1988).  The procedure for challenging the findings and recommendations of the magistrate judge is set out in more detail in SD ALA LR 72.4 (June 1, 1997), which provides, in part, that:

> A party may object to a recommendation entered by a magistrate judge in a dispositive matter, that is, a matter excepted by 28 U.S.C. § 636(b)(1)(A), by filing a "Statement of Objection to Magistrate Judge's Recommendation" within ten days after being served with a copy of the recommendation, unless a different time is established by order.  The statement of objection shall specify those portions of the recommendation to which objection is made and the basis for the objection.  The objecting party shall submit to the district judge, at the time of filing the objection, a brief setting forth the party's arguments that the magistrate judge's recommendation should be reviewed *de novo* and a different disposition made.  It is insufficient to submit only a copy of the original brief submitted to the magistrate judge, although a copy of the original brief may be submitted or referred to and incorporated into the brief in support of the objection.  Failure to submit a brief in support of the objection may be deemed an abandonment of the objection.

> A magistrate judge's recommendation cannot be appealed to a Court of Appeals; only the district judge's order or judgment can be appealed.

2.      **Opposing party's response to the objection.**   Any opposing party may submit a brief opposing the objection within ten (10) days of being served with a copy of the statement of objection.  Fed. R. Civ. P. 72; SD ALA LR 72.4(b).

3.      **Transcript (applicable where proceedings tape recorded)**.  Pursuant to 28 U.S.C. § 1915 and Fed.R.Civ.P. 72(b), the magistrate judge finds that the tapes and original records in this action are adequate for purposes of review.  Any party planning to object to this recommendation, but unable to pay the fee for a transcript, is advised that a judicial determination that transcription is necessary is required before the United States will pay the cost of the transcript.


 s / Kristi  D. Lee
**UNITED STATES MAGISTRATE JUDGE**